UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BENOIT BALDWIN,
    Plaintiff,

v.                                                                                   CIVIL ACTION NO. 1:19-11747-PBS

VINEYARD GAZETTE, LLC,
HEATHER HAMACEK,
MV TIMES CORPORATION,
& EDITH PRESCOTT,
*et al.*,
    Defendants.

REPORT AND RECOMMENDATION ON MOTION TO DISMISS FOR FAILURE TO
STATE A CLAIM FILED BY MV TIMES CORPORATION, EDITH PRESCOTT (#29) AND
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM BY HEATHER HAMACEK,
<u>VINEYARD GAZETTE, LLC (#39)</u>.

I. <u>Introduction</u>.

This action arises out of an argument between plaintiff, Benoit Baldwin, and defendant, Kyle Newell, that took place at the Martha's Vineyard Airport on July 22, 2016. (#1 ¶ 1.) On August 14, 2019, plaintiff, proceeding pro se, filed a complaint against Newell, the Town of West Tisbury (the Town), Dukes County (the County), as the owner and operator of the airport, and the following individuals: Town Selectmen Richard Knabel, Jeffrey Manter, and Cynthia Mitchell; Town Administrator Jennifer Rand; Town Police Chief Daniel Rossi; and Town Police Officer Garrison Viera (the municipal defendants); Town Counsel Ronald Rappaport; Airport Assistant manager Geoffrey Freeman; and taxicab driver Joseph Noel. *Id.* ¶¶ 4–17. The *Vineyard Gazette, LLC* (the *Gazette*), *Gazette* reporter Heather Hamacek, the *MV Times Corporation* (the *Times*), and *Times* reporter Edith Prescott were also named as defendants (the media defendants). *Id.* ¶¶

18–21.[1] Plaintiff alleges a claim for violation of the Massachusetts Wiretap Statute (count IX), *id.* ¶¶ 154–72, and a claim for defamation (count XII) against the media defendants, *id.* ¶¶ 185–96.

On November 16, 2019, the *Times* and Prescott filed a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). (#29.) The *Gazette* and Hamacek's 12(b)(6) motion followed on November 20, 2019. (#39.)[2] Both motions have been fully briefed (## 30, 40, 50, 57, 58) and are ready for disposition.

## II. Statement of Facts.

The following facts are taken from plaintiff's complaint (#1) unless otherwise indicated. Plaintiff was a taxicab driver and co-owner of a taxicab company called Alpha Taxi, permitted and licensed by the Town. *Id.* ¶¶ 3, 25. On July 22, 2016, plaintiff and defendant Newell, a driver for a different taxicab company, got into an argument outside the Martha's Vineyard Airport, after Newell wrongfully accused plaintiff "of swapping cabs outside the airport taxi line[.]" *Id.* ¶¶ 1, 26.[3] Plaintiff, who had been "subjected to years of similar harassment by Newell[,]" admittedly responded to Newell's accusation "with profanity and an ethnic slur." *Id.* ¶ 1. Shortly after the argument, Officer Leomar DeOliveira, a Town police officer on duty at the airport that day, interviewed plaintiff and Newell, and determined that Newell's allegation that plaintiff "had

---

[1] Two other named defendants, Samantha Church and James Hickey, who owned the taxicab company for which Newell drove, *see* #1 ¶¶ 14, 15, 16, were dismissed from the action on January 27, 2020. (#54.)

[2] Other defendants filed motions to dismiss (##21, 27, 29, 34), which are addressed in separate reports and recommendations

[3] Apparently, it is a violation of airport regulations to remove a taxicab from a line of waiting taxicabs and put another taxicab in its place. *See* #22-1 at 19.

swapped cabs outside the airport taxi line had no basis in fact." *Id.* ¶ 33. Officer DeOliveria did not take any further action or write an incident report. *Id.*

Although plaintiff did not know it, Newell, using his cell phone, recorded the incident with plaintiff. *Id.* ¶ 1.[4] On August 1, 2016, Newell submitted a written complaint to Freeman, which, according to plaintiff, contained a "verbatim transcription" of the recording. *Id.* ¶¶ 1, 37. While plaintiff admits that he used "profanity and an ethnic slur" while speaking to Newell, *id.* ¶ 1, Newell's written complaint gives more details. Newell's complaint relates that when he approached plaintiff and asked him if he had swapped the taxicab from the line, plaintiff answered, "What did you say, you k**e?" (#35-1 at 10.) When Newell said, "Excuse me?," plaintiff got out of his taxicab and asked Newell again, "What did you say, you f*****g k**e?" *Id.* As the two men continued to speak, plaintiff asked him, "What did you see, k**e?" and told him, "You saw nothing, k**e." *Id.* at 11.[5]

---

[4] Plaintiff filed an application for a criminal complaint against Newell in the Edgartown District Court on September 16, 2016, alleging that Newell violated the Massachusetts Wiretap Statute, Mass. Gen. Laws ch. 272, § 99 *et seq.* (#1 ¶ 62.) The application was denied on September 30, 2016. *Id.*

[5] The First Circuit has repeatedly cautioned that "[o]rdinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Graf v. Hospitality Mut. Ins. Co.*, 754 F.3d 74, 76 (1st Cir. 2014) (internal citations and quotation marks omitted). That said, "there is a narrow swatch of materials outside the complaint itself that may be considered on a motion to dismiss for failure to state a claim." *Ríos-Campbell v. U.S. Dep't. of Commerce*, 927 F.3d 21, 25 n.2 (1st Cir. 2019). "[W]hen . . . a complaint's factual allegations are expressly linked to – and admittedly dependent upon – a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) (internal citations and quotation marks omitted), *cert. denied*, 555 U.S. 995 (2008); *Yacubian v. U.S.*, 750 F.3d 100, 102 (1st Cir. 2014); *United Auto., Aerospace, Agric. Implement Workers of Am. Intern. Union v. Fortuno*, 633 F.3d 37, 39 (1st Cir. 2011). Newell's written complaint falls within this exception and may properly be considered, as plaintiff refers to it in his complaint. Moreover, plaintiff states that it contains a "verbatim transcription" of the argument, taken from the cell phone recording of the incident, which the court interprets to mean that plaintiff does not dispute that Newell's complaint is an accurate record of

After receiving the complaint from Newell, Freeman called Town Police Chief Rossi, who is also a defendant here. (#1 ¶ 39.) Rossi dispatched another defendant, Officer Viera, to the airport, and Viera met with Freeman and Newell. *Id.* Following his meeting with Freeman and Newell, Viera prepared an incident report, which was approved by defendant Manter, then a Town police sergeant and a member of the Town Board of Selectmen (the Board). *Id.* ¶¶ 40–41.[6] After reviewing Viera's incident report and Newell's complaint, the Board, comprised of Manter and

---

what transpired. (#1 ¶¶ 1, 37.) *See*, e.g., *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) (citations omitted) ("[C]ourts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to the plaintiffs' claim; or for documents sufficiently referred to in the complaint.").

Because they are either referred to in plaintiff's complaint or expressly linked to the factual allegations in the complaint, Hamacek and Prescott's articles (##30-1, 40-1), Viera's police report (#22-1 at 19–20), and the Board hearing minutes (#22-1 at 29–30), discussed *infra*, also fall within this exception.

[6] Viera's incident report, in full, states:

> On Monday August 1, 2016[,] at approximately 3:35pm, I received a call from Chief Rossi directing me to respond to the airport to meet with Assistant Manager Geoff Freeman about a taxi complaint.
> Upon my arrival I met with [Freeman] and Kyle Newell in the conference room. I was advised that on July 22, 2016 at approximately at 10:15pm, [Newell] observed [plaintiff] have his cab switch spots with another one of his cabs[,] which is a violation of Airport Rules. [Newell] walked over to [plaintiff] and "calmly" asked him if he had swapped vehicle[s] from outside the line. [Plaintiff] replied with an "alarmist tone" and asked [Newell,] "What did you say, you [k]**e?" [Newell] said, "Excuse me?" [Plaintiff] "jumped from inside his vehicle" and repeated himself saying[,] "What did you say, you stupid, f*****g k**e?" [Newell] stated that he saw him swap vehicles from outside the line. [Plaintiff] interrupted him and said, "What did you see, [k]**e?" [Newell] explained what he had [seen] and [plaintiff's] response was, "You saw nothing, [k]**e." [Newell] said that he said, "Okay. Thank you[,]" and walked away. [Newell] showed obvious signs of distress over this interaction even after 10 days.
> [Newell] had a statement written out and requested that I pass his letter and my report to the selectmen who issue the license for [plaintiff's] cab.

(#22-1 at 19–20.)

defendants Knabel and Mitchell, voted to send plaintiff a letter of inquiry, stating that "[t]he Board of Selectmen have been provided with a copy of an incident report filed with the [Town] Police Department . . . regarding an incident that reportedly took place on July 22, 2016 at the MV Airport." *Id.* ¶¶ 43, 45. Plaintiff admittedly did not respond to the Board's original letter of inquiry, received on August 19, 2016, or a second letter of inquiry, sent on or about October 20, 2016. *Id.* ¶¶ 44, 64.[7]

In December 2016 and early January 2017, defendant Rand (the Town Administrator) sent plaintiff an email and an additional letter, informing him that a hearing on Newell's complaint would be held in front of the Board on January 11, 2017. *Id.* ¶¶ 69–70. Plaintiff did not attend the hearing to contest Newell's allegations against him. *Id.* ¶ 71. The hearing was open to the public, and the hearing minutes indicate that both Hamacek and Prescott were present. (#22-1 at 29.)

During the hearing, Selectmen Knabel asked Newell, who participated by speakerphone, if the allegations in his written complaint fairly represented what transpired during his argument with plaintiff, and Newell replied they did. (# 1 ¶¶ 69, 73.) Newell then "proceeded to slander [plaintiff] by conflating his private grudges with [plaintiff's] fitness for his profession." *Id.* ¶ 74. Following the hearing, the Board voted to suspend plaintiff's taxi-driving permit for two weeks in July and August 2017, based on plaintiff's violation of Town Taxi Regulation 6.4, which states that "taxicab operators shall conduct themselves in a courteous and professional manner at all times." *Id.* ¶¶ 1, 76, 143. Town Administrator Rand read Regulation 6.4 aloud at the hearing. *Id.* ¶ 76.

---

[7] Plaintiff alleges that he received a copy of defendant Viera's police report via mail from Rossi on or about September 6, 2016, giving him notice of Newell's complaint letter. (#1 ¶¶ 58–59.) Plaintiff alleges that "[o]n receipt of Newell's complaint letter around a week later, [he] realized that Newell had secretly recorded their July 22, 2016 confrontation." *Id.* ¶ 60.

On January 12, 2017, the *Gazette* published an article authored by Hamacek entitled "West Tisbury Taxi Driver Faces Two-Week Suspension" on its website. *Id.* ¶ 78. Hamacek's article summarized Newell's complaint and the January 11, 2017 hearing, noting that Newell had claimed that plaintiff had "used an ethnic slur against him after there was some argument over a swap of vehicles in the taxi line." *Id.*[8] Around the same time, defendant Prescott of the *Times* published a

---

[8] Hamacek's *Gazette* article is reproduced in full:

WEST TISBURY TAXI DRIVER FACES TWO-WEEK SUSPENSION.

West Tisbury selectmen voted this week to suspend a taxi driver's permit for two weeks, following a complaint of an incident over the summer involving an alleged racial epithet.

Alpha Taxi owner Benoit Baldwin will have his permit suspended for 14 days beginning July 22.

The complaint against Mr. Baldwin was filed in early August by Kyle Newell, a driver working for Bluefish Taxi. In the complaint, he described an alleged incident that took place in the taxi queue at the Martha's Vineyard Airport. Among other things Mr. Newell claimed that Mr. Baldwin used an ethnic slur against him after there was some argument over a swap of vehicles in the taxi line. The complaint was filed with the Martha's Vineyard airport manager, the West Tisbury police and town selectmen.

Selectmen held a hearing on the matter during their regular meeting on Wednesday. Mr. Newell, who has since moved off the Island, participated by speaker phone. Mr. Baldwin did not attend.

Town administrator Jennifer Rand told the [B]oard that she had sent two letters to Mr. Baldwin, one in August and one in October, asking Mr. Baldwin to respond to the complaint. A third letter and also an email were sent to Mr. Baldwin notifying him of the hearing Wednesday, Ms. Rand said. The letters were sent by certified mail. The letters were received, and there was no indication that the email was read or not, she said.

Mr. Newell said his written complaint is a true representation of what happened, in his opinion.

"I'm at a loss for words because it was so long ago and I still think about it to this day," he said. "It's such a nasty thing."

Town taxi regulations stipulate that cab operators must "conduct themselves in a courteous and professional manner at all times." If the regulations are not adhered to, the selectmen have the right to revoke or suspend a permit. If an incident endangers public safety, the police may suspend the permit. The police did not consider the incident a matter of public safety, Ms. Rand said.

similar article, entitled "West Tisbury selectmen suspend taxi license at hearing[,]" both online and in the *Times'* weekly print edition. *Id.* ¶¶ 80, 82. Plaintiff claims that "Prescott's article extensively quoted Newell's complaint letter, including that portion which was a transcription of his [allegedly] illegal recording." *Id.* ¶ 81. Plaintiff alleges that, shortly thereafter, Prescott's article was also shared in a Town Facebook group. *Id.* ¶ 84.[9]

---

> "I would certainly believe there would be some sort of suspension in order here," said [S]electman Jeffrey (Skipper) Manter 3rd. "I think the suspension should almost reflect the time of year the offense took place."
> Selectmen Cynthia Mitchell pointed out the suspension would affect Mr. Baldwin's right to drive one of his cabs, but not his cab business as a whole.
> "Two weeks in the height of the summer is, I suppose, a lot – I think this is serious," Mrs. Mitchell said. "Whatever time frame or period, I agree he should have a suspension of his permit. And he should know that if anything like this happens again, then we'll consider revoking."
> Taxi licenses are renewed every April, and permits are authorized by the police department. Selectmen said they could not recall ever suspending a taxi permit.
> Ms. Rand said she will send Mr. Baldwin a letter by certified mail notifying him of the suspension.

(#40-1.)

[9] Prescott's *Times* article is reproduced in full:

West Tisbury selectmen suspend taxi license at hearing.

*Alpha Taxi Owner Benoit Baldwin will miss two weeks driving next summer for his verbal assault of Kyle Newall.*

On Wednesday, Jan. 11, West Tisbury selectmen conducted a taxi hearing with former Bluefish taxi driver Kyle Newall and Benoit Baldwin – who was not present. Mr. Newall had filed a complaint with the West Tisbury police for being verbally assaulted by Alpha Taxi owner Benoit Baldwin, July 22, 2016. Selectmen suspended Mr. Baldwin's taxi driving permit for two weeks beginning July 22, 2017 – which is the exact day of the incident in 2016.
> In his hand-written complaint to the West Tisbury selectmen and the airport manager, Mr. Newell wrote that he "witnessed Benoit Baldwin of Alpha Taxi swap different vehicles from outside the taxi line."
> Mr. Newell said he got out of his car to ask Mr. Baldwin if what Mr. Newell saw was indeed what happened and if it was allowed. Mr. Newell alleged that Mr.

7

Baldwin said to him, "What did you say, you k**e?" And when a startled Mr. Newall said, "Excuse me?" (to make sure he heard correctly), Mr. Newall said that Mr. Baldwin repeated even louder, "What did you say, you stupid, f*****g k**e?"

When Mr. Newall tried again to explain what he saw, reportedly Mr. Baldwin said, "You saw nothing, k**e."

"I was absolutely appalled to hear this anti-Semitic word," Mr. Newall said in his written complaint.

"I could see that it would do no good to continue the conversation, so I quietly said, 'OK, thank you,' before I walked away from the most violating, racist, intense verbal aggression of my entire life," Mr. Newall wrote.

"If the other party is not present we can't really hold a hearing," [B]oard [C]hairman Richard Knabel said. "There's really no action that we would take in the absence of the other person's presence."

"You can," [T]own [A]dministrator Jennifer Rand said. "The complainant is here and the person who had the opportunity to speak against the complaint has chosen not to be here."

"The hearing has written evidence. Benoit is not here, he apparently does not wish to participate, and he has all the materials, so he knows what the complaint is about," [S]electman Cynthia Mitchell said. "We have not heard from him, so it wasn't as though he needed a different time. He's just failed to show up."

Selectmen decided to proceed with the hearing despite Mr. Baldwin's absence.

Town [A]dministrator Jennifer Rand tried to contact Mr. Baldwin via numerous methods: letter, phone, email, but Mr. Baldwin never responded. Mr. Newall now lives in Colorado and participated in the hearing by telephone. Town Counsel had said that this method of participating was up to the selectmen's discretion; they decided to allow it.

"I'm kind of at a loss for words," Kyle Newall said. "Such a nasty thing. For someone to be an ambassador to the Island – it shocked me."

"I think this is serious," Ms. Mitchell said.

Ms. Rand read Taxi Regulation 6.4 [a]loud to the meeting:

"Taxi[]cab operators should conduct themselves in a courteous and professional manner at all times. No operator may interfere with the business transactions of another taxi cab once the fare is on board."

She continued by citing Taxi Regulation 6.8:

"If at any time during the time of a permit if the [B]oard or the police department becomes aware that the permit holder no longer complies with these regulations or may otherwise be unsuitable to hold a permit [then] the police department may suspend the permit. If the violation endangers public safety the suspension may be immediate. In such instances a hearing before the [B]oard will be held as soon as possible to determine the continued status of the permit. If the violation does not endanger public safety, there should be a hearing before the [B]oard to determine if the permit shall be revoked or suspended."

"It was not considered an issue of public safety," Ms. Rand said.

Plaintiff claims that the media defendants' reporting of the Board's decision, without seeking any comment from him, caused his taxicab company to lose major clients. *Id.* ¶ 1. Following the articles and posts in the Facebook group, at least two separate entities terminated their relationship with Alpha Taxi, citing plaintiff's altercation with Newell. *Id.* ¶¶ 86, 90.

For the reasons set out below, the court recommends that the media defendants' motions to dismiss (##29, 39) be granted.

### III. Legal Standard.

A Rule 12(b)(6) motion to dismiss challenges a party's complaint for failing to state a claim. In deciding such a motion, a court must "treat all well-pleaded facts in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 919 F.3d 121, 127 (1st Cir. 2019) (citing *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011)). When considering a motion to dismiss, a court "may augment these facts and inferences with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013) (citing *Haley v. City of Bos.*, 657 F.3d 39, 46 (1st Cir. 2011)).

---

"He should have a suspension of his permit," Ms. Mitchell said. "And he should know that if anything like this happens again, that we will consider revoking. While this is documented and on the record, there is, as I understand it, significant anecdotal information about Mr. Baldwin having taken his liberties in other situations, so it's not the first we've heard about this."

Selectman Jeffrey "Skipper" Manter thought the suspension should reflect the same time of year that the original incident took place, which was July 22, 2016 – so Mr. Baldwin's two-week taxi driving permit suspension will commence July 22, 2017.

The Town of West Tisbury is being sued by Mr. Baldwin of Alpha Taxi for its lack of Uber regulations in a completely separate case.

(#30-1.)

In order to survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The "obligation to provide the grounds of [the plaintiff's] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (quotation marks and alteration omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level," and to cross the "line from conceivable to plausible." *Id.* at 555, 570.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). However, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). Simply put, the court should assume that well-pleaded facts are genuine and then determine whether such facts state a plausible claim for relief. *Id.* at 679.

"Where, as here, the plaintiff is proceeding pro se, the court must construe his allegations liberally." *Rick v. Profit Mgmt. Assocs.*, 241 F. Supp.3d 215, 218 (D. Mass. 2017) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "However . . . , even a pro se plaintiff is required to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Strahan v. AT&T Mobility LLC*, 270 F. Supp. 3d 535, 540 (D. Mass. 2017) (internal citations and quotation marks omitted).

IV.  Analysis.

A.  Count IX—Violation of the Massachusetts Wiretap Statute, Mass. Gen. Laws ch. 272, § 99, *et seq*.

"Plaintiff seeks redress for" the media defendants' "unauthorized interception and use of his oral communication pursuant to [Mass. Gen. Laws ch.] 272, § 99(Q)." (#1 ¶ 172.) The Wiretap

10

Statute "forbids the interception of certain oral communications by private individuals[.]" *Commonwealth v. Santoro*, 406 Mass. 421, 423 (1990). The statute provides that "[a]ny aggrieved person whose oral . . . communications were intercepted, disclosed[,] or used . . . shall have a civil cause of action against any person who so intercepts, discloses[,] or uses such communications . . . ." Mass. Gen. Laws ch. 272, § 99(Q). The statute specifically prohibits, among other actions, the interception of the oral communications and the "disclosure or use of . . . oral communications[.]" *Id.*, § 99(C)(1), (3). The statute defines "use" to include "willfully us[ing] or attempt[ing] to use the contents of any wire or oral communication, knowing that the information was obtained through interception[.]" *Id.*, § 99(C)(3)(b).

Plaintiff claims that Hamacek and Prescott "used Newell's complaint letter" (which contained a verbatim transcription of Newell's cell phone recording) "as a source" for their articles in the *Gazette* and the *Times.* (#1 ¶¶ 167–68.) However, plaintiff fails to allege that either Hamacek or Prescott knew, or had reason to know, that the contents of Newell's complaint came from an intercepted recording. Rather, the facts alleged within plaintiff's complaint make clear that both Hamacek and Prescott obtained the information from Newell's complaint at the Board's hearing, after the police lawfully investigated plaintiff's claims and prepared a report. Plaintiff therefore fails to state a claim for violation of the Wiretap Statute against any of the media defendants. Count IX should be dismissed.

B.  Count XII—Defamation.

"Defamation is the publication, either orally or in writing, of a statement concerning the plaintiff which is false and causes damages to the plaintiff." *Yohe v. Nugent*, 321 F.3d 35, 39–40 (1st Cir. 2003) (internal citation omitted). Plaintiff claims that the media defendants' articles were defamatory in the following respects:

11

1. Hamacek's *Gazette* article and Prescott's *Times* article, republishing Newell's alleged defamatory allegations against plaintiff (that he swapped cabs out of line and "used profanity and an ethnic slur") "were in general neither accurate nor fair, especially as no part of [his] side of the story was investigated, reported, or solicited . . . ." (#1 ¶¶ 186–87, 190–91.)

2. The sub-headline of Prescott's *Times* article, "'Alpha Taxi owner Benoit Baldwin will miss two weeks driving next summer for his verbal assault of Kyle Newell . . .' inaccurately implied that the [Town S]electmen made clear a verbal or written decision on the record to that effect, when they most assiduously did not." *Id.* ¶ 192.

3. Prescott wrongly printed the following "slander" from Newell in her *Times* article: "I'm kind of at a loss for words . . . . [S]uch a nasty thing. For someone to be an ambassador to the island [– ]it shocked me." *Id.* ¶¶ 188, 193.[10]

This claim fails because the fair report privilege applies. "Massachusetts has long recognized a privilege for fair and accurate reports of official actions and statements." *Howell v. Enter. Publ'g Co., LLC*, 455 Mass. 641, 650 (2010); *see Butcher v. Univ. of Mass.*, 483 Mass. 742, 748 (2019); Restatement (Second) of Torts § 611 (1977). The purpose of this "fair report privilege" is "to ensure that [the media] may perform the important function of informing the public of actions taken by government agencies and officials." *Yohe*, 321 F.3d at 43 (citations omitted). "Massachusetts requires that 'the privilege be construed liberally and with an eye toward disposing of cases at an early stage of litigation.'" *Mullane v. Breaking Media, Inc.*, 433 F. Supp.3d 102, 109 (D. Mass. 2020) (quoting *Howell*, 455 Mass. at 653).

---

[10] Hamacek's *Gazette* article contained a similar statement. *See* #40-1 at 2.

In order to invoke the privilege, the media defendants bear the burden of demonstrating that the articles were reporting on "official" government actions or statements, and that the articles constitute a "fair and accurate" report. *Alharbi v. TheBlaze, Inc.*, 199 F. Supp.3d 334, 352 (D. Mass. 2016). "To defeat the privilege, . . . plaintiff must either show that the publisher does not give a fair and accurate report of the official statement or action, or malice." *Howell*, 455 Mass. at 651 n.8 (citations omitted). Plaintiff fails to allege how any of the media defendants acted with malice. Therefore, the court will focus on the fairness and accuracy of the media defendants' articles. *See id.*

Both Hamacek and Prescott's articles reported on official government actions and statements. "A textbook form of an official action or proceeding is a public hearing before [a] governmental body," such as the hearing before the Board in this case. *Howell*, 455 Mass at 656. Other examples of "official actions and statements" include decisions by a board of selectmen, police investigations, and police reports. *See id.* at 659–60; *Butcher*, 483 Mass. at 755 (noting that "once police undertake an official response to a complaint, both that response and the allegations that give rise to it fall within the fair report privilege"); *Yohe*, 321 F.3d at 43. Plaintiff does not dispute that Newell made his allegations and comments – that plaintiff had "used profanity and an ethnic slur" and swapped cabs outside of the taxi line, and that he was "at a loss for words" due to plaintiff's alleged actions – in his complaint, which became part of the Town police department's investigation and Viera's police report, or at the public hearing in front of the Board. Plaintiff also concedes that Prescott's sub-headline in the *Times*, indicating that plaintiff "will miss two weeks driving . . . for his verbal assault of" Newell, reported on the Board's hearing. *See* #1 ¶ 192.

Both Hamacek and Prescott's articles were fair and accurate. "Whether a report was fair and accurate is a matter of law to be determined by a judge unless there is a basis for divergent

views." *Howell*, 455 Mass at 661 (citing *Joyce v. Globe Newspaper Co.*, 355 Mass. 492, 498–99 (1969)). "This accords with the general policy of conferring the privilege in the first place: ensuring certain conduct is not deterred out of concern of being haled before a jury." *Id.* (citing *ELM Med. Lab., Inc. v. RKO Gen., Inc.*, 403 Mass. 779, 786 (1989)). To meet the accuracy "standard, a publisher must show only the factual correctness of the events reported, and not the truth about the events that actually transpired." *Butcher*, 483 Mass. at 757 (internal citations and quotation marks omitted). The Massachusetts Supreme Court recently explained in *Butcher*:

> We consider fairness and accuracy as two separate but related elements. "A report is accurate if it 'conveys to the persons who read it a substantially correct account of the proceedings.'" *Howell*, 455 Mass. at 651 [(]quoting Restatement (Second) of Torts § 611 comment f (1977)[)]. "It is fair so long as it is not 'edited and delated as to misrepresent the proceeding and thus be misleading.'" *Howell*, [455 Mass. at 661–62 (]quoting Restatement (Second) of Torts [§ 611 comment f]).
>
> . . . We review the attributed statements in the context of the entire publication, and the addition or reframing of information can remove otherwise fair and accurate statements from the privilege. *See Brown v. Hearst Corp.*, 54 F.3d 21, 25 (1st Cir. 1995).

*Id.* at 756–57.

Plaintiff does not allege that Newell's allegations and comments were edited so that they misrepresented the proceedings or were misleading or unfair. Even if Newell's allegation that he swapped cabs outside the taxi line could be proven false, and his comment that he was at a "loss for words" could be construed to have a defamatory meaning, the media defendants' republication of them is still considered accurate. *Id.* at 757; *see also Howell*, 455 Mass. at 657–58 ("[r]eports of official statements are covered by the privilege so long as the reports fairly and accurately describe the statements, even though the statements themselves may contain defamatory material"); *Yohe*, 321 F.3d at 44.

14

Prescott's sub-headline in the *Times*, indicating that plaintiff "will miss two weeks driving . . . for his verbal assault of" Newell, is also fair and accurate. "A statement is considered a fair report if its gist or sting is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced." *Howell*, 455 Mass. at 662 (quoting *ELM Med. Lab., Inc.*, 403 Mass. at 783); *see also Butcher*, 483 Mass. at 757 (internal citations and quotation marks omitted) (inaccuracies "do not amount to falsity so long as the substance, the gist, [and] the sting, of the libelous charge be justified"); *Mullane*, 433 F. Supp.3d at 109.

Plaintiff alleges in his complaint that he was suspended based on his violation of Town Taxi Regulation 6.4, which requires "taxicab operators to conduct themselves in a courteous and professional manner at all times." (#1 ¶¶ 1, 71, 76, 143.) He admits that he called Newell a "k**e" and used profanity towards him, that his comments were recorded and became part of Newell's complaint, and that his hearing was based on Newell's complaint. *See* #1 ¶¶ 32, 187, 192. Though none of the materials explicitly state whether plaintiff's permit was suspended due to his verbal assault of Newell, plaintiff's actions in getting out of his car, swearing at, and repeatedly calling Newell an antisemitic slur violated Regulation 6.4 under any definition of "courteous and professional." Newell's complaint and Viera's police report also focus on the offensive slur and profanity plaintiff used, such that a reader would be able to infer that they were the reason for his suspension. Regardless of the precise reason for plaintiff's suspension, the "gist or sting" of Prescott's article remains true. *See Howell*, 455 Mass. at 662.

Plaintiff's allegation that the media defendants wrongfully failed to investigate or report plaintiff's side of the story, *see* #1 ¶¶ 190–91, cannot defeat the fair report privilege. Even if one assumes that Hamacek and Prescott were negligent in failing to interview plaintiff, a newspaper's misconduct "must amount to more than negligent, or even knowing, republication of an inaccurate

official statement[,]" in order to defeat the fair report privilege. *Yohe*, 321 F.3d at 44. Plaintiff fails to allege that the statements within Hamacek and Prescott's articles were inaccurate under the fair report privilege, or how the media defendants' actions could possibly have amounted to anything more than negligence.

Because the media defendants' articles are protected by the fair report privilege, the court need not analyze whether any of the statements could be considered defamatory. *See Howell*, 455 Mass. at 669 (emphasis added) ("the defamatory nature of the alleged insinuations is relevant only after finding that the [media defendant] did *not* give a fair or accurate report of those insinuations"). Count XII against the media defendants should be dismissed.

## V. Conclusion.

For the reasons stated above, it is recommended that the media defendants' motions to dismiss (##29, 39) be granted.

## VI. Review by District Judge.

The parties are hereby advised that any party who objects to this recommendation must file a specific written objection thereto with the Clerk of this Court within fourteen days of service of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *U.S. v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *U.S. v. Vega*, 678 F.2d 376, 378–79 (1st Cir. 1982); *Park Manor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

August 26, 2020                                                                 /s/ M. Page Kelley
                                                                                M. Page Kelley
                                                                                United States Magistrate Judge